CLERKS OFFICE US DISTRICT COURT
AT ROANOKE, VA
FILED
August 31, 2026
LAURA A. AUSTIN, CLERK
BY: /s/ Megan Poff
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| JACK THOMAS, JR., Plaintiff, | ) | Civil Action No. 7:25-cv-00109 |
| v. | ) | |
| J. ADAMS, *et al.*, Defendants. | ) | By: C. Kailani Memmer United States Magistrate Judge |

**MEMORANDUM OPINION**

Jack Thomas, Jr., a Virginia inmate proceeding *pro se*, filed this civil action under 42 U.S.C. § 1983 against correctional officers at River North Correctional Center ("River North"). The case was transferred to the undersigned magistrate judge with the consent of the parties pursuant to 28 U.S.C. § 636(c). Prior to the transfer, Thomas filed two motions for spoliation sanctions. ECF Nos. 84 and 113. On August 24, 2026, the court conducted an evidentiary hearing on the motions. For the reasons set forth below, the motions for spoliation sanctions are **DENIED**.

**I. Background**

This case was initially assigned to United States District Judge Michael F. Urbanski. The Office of the Attorney General of Virginia received notice of the original complaint on May 20, 2025, *see* ECF No. 6, and Thomas subsequently requested leave to file an amended complaint, ECF No. 46. On November 18, 2025, Judge Urbanski partially dismissed Thomas's amended complaint under 28 U.S.C. § 1915A(b)(1) and permitted two claims to proceed: (1) Thomas's claim that River North K-9 Officer J. Adams allowed a dog to dart within a few inches of his face and arm on June 30, 2023, in retaliation for filing grievances; and (2) Thomas's claim that unknown shakedown officers collectively referred to as John Doe #4 destroyed his Bible and other religious texts during a cell search conducted on August 24, 2023, in retaliation for filing

grievances. *See* Mem. Op., ECF No. 63, at 21–24; Order, ECF No. 64 at 1. Defense counsel later identified the unknown shakedown officers as P. Parson and D. Melton, *see* ECF Nos. 82 and 83, and Thomas filed a second amended complaint against Adams, Parson, and Melton on January 12, 2026, ECF No. 96.

In the meantime, Thomas filed the first motion for spoliation sanctions. That motion pertains to Thomas's claim of retaliation against Defendant Adams. Thomas alleges that Adams allowed a dog to come within a few inches of his face and arm on June 30, 2023, less than 24 hours after he left the prison library with his grievance paperwork and was pointed out to Adams outside the chow hall by Correctional Officer Blevins. Thomas argues that he filed written complaints requesting that video footage be preserved of both incidents—Blevins pointing him out to Adams on June 29, 2023, and Adams allowing a dog to dart toward him on June 30, 2023. Although prison officials preserved video footage from June 30, they did not preserve video footage from outside the chow hall on June 29, and Thomas contends that the footage preserved from June 30 is of poor quality and does not actually show the incident involving the dog.

The second motion for spoliation sanctions pertains to Thomas's claim that Parson and Melton retaliated against him by destroying his Bible and other religious texts during a cell shakedown conducted on August 24, 2023. Thomas previously requested the production of a shakedown report associated with the search of his cell, and he was advised that shakedown reports are only kept for one year. Thomas argues that the shakedown report should have been preserved after he filed written complaints regarding the search of his cell. Thomas also argues that the video footage saved from August 24 is of poor quality and does not clearly show the officers responsible for searching his cell.

The motions for spoliation sanctions have been extensively briefed by the parties, and the court held a status conference regarding the motions and other matters on July 20, 2026. On July 31, 2026, the court granted Thomas's motions for an evidentiary hearing on the spoliation motions. *See* Order, ECF No. 181. The court directed defense counsel to make arrangements for a witness to testify at the hearing who has knowledge of the video system utilized at River North in 2023, Thomas's requests to preserve video footage, and the Virginia Department of Corrections ("VDOC") policies and procedures applicable to the preservation of video evidence. *Id.* at 1. The court also directed defense counsel to make arrangements for a witness to testify who has knowledge of the cell shakedown records maintained by River North; Thomas's request for the shakedown report associated with the search of his cell on August 24, 2023; and the VDOC and Library of Virginia policies and procedures applicable to the retention of shakedown reports. *Id.* at 1–2. The court further directed defense counsel to make arrangements for Thomas to review all of the retained video footage again in preparation for the evidentiary hearing. *Id.* at 2. Defense counsel also submitted the preserved video footage for *in camera* review on July 27, 2026, as requested during the status conference. *See* Updated Video Chart, ECF No. 192 (listing each of the preserved video files uploaded to the court's Box.com folder).

Thomas subsequently filed motions requesting limited discovery. ECF Nos. 179 and 180. The motions were granted in part on August 17, 2026, ECF No. 186, and arrangements were made for Thomas to receive responses to certain discovery requests in advance of the evidentiary hearing.

## II. Testimony and Other Evidence

During the evidentiary hearing on August 24, 2026, the parties presented testimony and documentary evidence. The witnesses included R. O'Brien, J. McBride, R. Hickman, and Thomas.

The first witness, R. O'Brien, is a records administrator for the VDOC. In that position, O'Brien works to ensure that the VDOC complies with records retention policies established by the Library of Virginia.[1] The policies include Library of Virginia Records Retention and Disposition Schedule No. 701-100. *See* Pl.'s Evid. H'rg Ex. 5, ECF No. 195-5. The schedule includes a provision applicable to reports and forms documenting "the shakedowns of . . . individuals and/or units in which nothing was found that required the completion of an incident report."[2] *Id.* at 7. The scheduled retention period for "no incident" shakedown reports is "1 Year after end of calendar year." *Id.*

O'Brien explained that the specified retention period for a particular record is based on the record's function and value. He testified that a "no incident" shakedown report is considered to be of lower value than records subject to longer retention requirements and that he has never received a subpoena or Freedom of Information Act ("FOIA") request for that type of report.

The second witness, J. McBride, is an agency management analyst in the operations department at River North. Prior to being selected for the analyst position in 2023, McBride worked as a secretary for the chief of security. She was replaced in that position by A. Suit.

McBride testified that the reports prepared in connection with cell shakedowns were delivered to the secretary's office to be stored in a filing cabinet. During her tenure as secretary, McBride retained the reports for one year in accordance with the applicable Library of Virginia retention and disposition schedule. On December 5, 2024, Suit sent McBride an email asking how

[1] Pursuant to the Virginia Public Records Act, the Library of Virginia is "the official custodian and trustee for the Commonwealth of all public records of whatever kind . . . that are transferred to it from any agency," and it is also responsible for "administrative control" of public records. Va. Code. § 42.1-79(A).

[2] It appears undisputed that the search of Thomas's cell on August 24, 2023, fell within that category.

long the shakedown forms needed to be retained. Defs.' Evid. H'rg Ex. 1, ECF No 195-7. McBride responded that the shakedown forms needed to be kept for one year. *Id.*

McBride testified that the Office of the Attorney General contacted her office in approximately June 2025 and requested the records from the shakedown conducted of Thomas's cell on August 24, 2023. McBride testified that she contacted Suit regarding the request and that Suit informed her that the shakedown reports from August 24, 2023, had been destroyed in January 2025, as permitted by the Library of Virginia retention and disposition schedule.

The next witness, R. Hickman, worked as an institutional investigator at River North in 2023. In that position, Hickman was responsible for saving video footage referenced in administrative grievances and complaints filed by inmates.

Hickman testified that she recalled receiving grievance paperwork from Thomas regarding an incident that occurred on June 29, 2023. The record includes a written complaint that Thomas submitted on July 4, 2023, which contained the following allegations:

> On 6/29/23 I went to my scheduled 3 pm to 5 pm scheduled law library appointment at approximately 3:00 p.m. but was sent back to my housing unit after only 16 minutes without justification. This was not done for a legitimate correctional purpose. Rather it was retaliation done solely because I exercised my protected First Amendment right of free speech. The officer responsible for this retaliation is C/O Blevins. VCE school was let out for the other inmates at the normal time of 4:30 p.m. on this same day. Please note, after throwing me out of the law library C/O Blevins is seen sitting on the walkway in front of the chow hall talking to and identifying me to the K9 officer at approximately 4:11 p.m. after abandoning her post at the law library on 6/29/23. At least 4 or 5 other officers i.e. (sergeants and lieutenants) were right inside the dining hall pulling chow. I am requesting per OP 866.1 all security camera footage and log book entries of this incident be preserved for the record.

Defs.' Evid. H'rg Ex. 2, ECF No. 195-8. Thomas then filed a regular grievance containing the same information. Defs.' Evid. H'rg Ex. 3, ECF No. 195-9.

Thomas also filed a separate written complaint regarding the dog incident that allegedly occurred on June 30, 2023. *See* Pl.'s Mot. for Spoliation Sanctions Ex. 1, ECF No. 84-1 at 2. That complaint included the following allegations:

> On 6/30/03 at approximately 6:50 am when I was walking to breakfast on the main walkway the K9 officer on said walkway released the slack in the strap to the dog he controls allowing the dog to dart towards me and stand on his hind feet, coming within 3 inches of my left arm and face. It was so startling to me I threw my hands in the air and leaned towards the fence to evade the vicious snapping of the teeth and barking of the K9 as it tried to bite me in the face and on my arm. This is a clear attempt to create fear, intimidate and most importantly retaliate against me for exercising my protected first amendment right of free speech. OP 435.5 prohibits the K9 officers from having their dogs within 15 feet of me so this was [a] deliberate act directly related to the events that occurred with C/O Blevins on 6/29/23 at 4:11 pm at dinner time. Per OP 866.1 I am requesting that all camera security footage of this incident be saved.

*Id.*

Although Hickman did not personally respond to Thomas's written complaints, a progress note prepared by a mental health clinician indicates that Thomas's concerns were "passed on" to Hickman and another officer. Pl.'s Evid. H'rg Ex. 2, ECF No. 195-2. Hickman testified that she or someone else in her office would have been responsible for saving the requested video footage and that she could not recall whether she or another employee preserved the footage referenced in Thomas's grievances.

Hickman was also shown a written complaint that Thomas submitted regarding the cell search conducted on August 24, 2023. Pl.'s Evid. H'rg Ex. 1, ECF No. 105-1 at 1. That complaint, which was logged as RNCC-23-INF-01582, included the following allegations:

> On 8/24/23 at approximately 11:45 am I was chosen to have to submit to a drug test and body scan despite the drug and contraband cell phone sniffing dog not giving any indication that I or my cell had drugs or a contraband smell on me or in my cell C-3-319. This

> was done out of retaliation in order to take me to the intake portion of the prison so my cell C-3-319 could be searched outside my presence by an unknown number of John Doe officers. I am requesting every security camera and the footage from each and all angles of this incident be preserved pursuant to VDOC OP 866.1 III, C., 7.f & OP 030.1 from 8:30 am to 12:30 pm.

*Id.* The complaint indicates that Hickman provided the following response:

> Your allegation of your cell being searched "despite the drug and contraband cell phone sniffing dog not giving any indication" is false. Therefore not done in retaliation. Your cell was searched during quarterly shakedown along with all other cells in C3 pod. [Y]our requested video has been saved.

*Id.* When asked about the response, Hickman testified that she could not recall whether she or someone else in her office saved the requested video footage. She also testified that she was unaware of any way to determine who saved a particular video file.

The record also includes a separate written complaint that Thomas filed against "John Doe Shakedown Officers." ECF No. 34-1 at 16. In that complaint, Thomas alleged that the unknown officers had "torn up" various religious texts while searching his cell on August 24, 2023, and that he did not know the officers' names. *Id.* He further asserted that the officers "did this out of retaliation" and that they left his grievance papers on top of his "obliterated property" as if to warn him that he should stop filing grievances. *Id.* He requested that security footage of the incident be saved in accordance with VDOC Operating Procedure (OP) 866.1. *Id.* On August 31, 2023, Hickman responded: "Please see answer to RNCC-23-INF-01582." *Id.*

During the evidentiary hearing, Thomas asked Hickman how she determined the timeframe or length of video footage to save in response to an inmate's preservation request. Hickman testified that she typically relied on the particular time or timeframe referenced in an inmate's complaint or grievance. She also testified that if a complaint or grievance listed an approximate time of an incident, she would generally allow for a five-minute window before and after the

specified time. For instance, if an inmate alleged that an incident occurred at approximately 12:05, Hickman would save footage from 12:00 to 12:10.

Hickman was also asked about the particular surveillance cameras utilized at River North in 2023. Hickman testified that the SCORE unit had both Rapid Eye and Max Pro cameras but that all other areas of the facility only had Rapid Eye cameras. Hickman confirmed that Rapid Eye footage has no audio and that the footage is of lesser quality than that recorded by Max Pro cameras. However, she testified that there was nothing unique about the quality of the Rapid Eye footage saved in response to Thomas's grievances. When asked how she would identify people shown in poorer quality footage of a cell shakedown, Hickman testified that she would review all of the available information as part of her investigation, including the shakedown paperwork.

Thomas introduced several VDOC operating procedures as exhibits. OP 030.1, *Evidence Collection and Preservation*, provides that access to a facility's digital storage folder "will be limited to designated staff" and that "[i]f a grievance is received that references a specific audio or video recording, a copy of the recording must be saved in the digital storage folder." OP 030.1 §§ III(C)(2) & (D), Pl's Evid. H'rg Ex. 3, ECF No. 195-3. The policy also states that "digital evidence must be retained for at least five years after the date of the incident." *Id.* § III(F). Hickman testified that she had access to the digital storage folder at River North and that she or someone else in her office was responsible for saving video footage in the folder.

OP 025.3, *Public Records Retention and Disposition*, "establishes the general responsibilities for management, retention, and disposition of [VDOC] records as provided by the *Virginia Public Records Act*." OP 025.3 at 4, Pl's Evid. H'rg Ex. 4, ECF No. 195-4. The operating procedure provides that "[a]ll DOC records must be managed in accordance with the most current Library of Virginia approved records retention and disposition schedules." *Id.* § V(A).

OP 866.1, *Inmate Grievance Procedure*, also includes a provision applicable to the preservation of video and audio recordings. It states that "[w]hen a grievance references a specific audio or video recording, the Institutional Ombudsman must request the Institutional Investigator make a copy of the recording and maintain it until exhaustion of administrative remedies or pending litigation in accordance with Operating Procedure 030.1, *Evidence Collection and Preservation*." OP 866.1 § III(C)(7)(f), Pl.'s Evid. H'rg Ex. 6, ECF No. 195-6.

The final exhibit introduced at the hearing was a blank VDOC River North shakedown report. *See* Defs.' Evid. Hr'g Ex. 4, ECF No. 195-10. The report includes designated spaces for the following information to be logged: the names of the shakedown officers and inmate; the date and location of the shakedown; whether damaged state property, excessive state property, or contraband was found during the shakedown; whether personal appliances such as a television or JP player were located and found to be working during the shakedown; whether any deficiencies were noted during the shakedown; and whether any charges are pending against the inmate. *Id.*

## III. Discussion

### A. Legal Standards

"Spoliation refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Silvestri v. General Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001). A party seeking spoliation sanctions must show that spoliation occurred and that the requested sanctions are warranted under governing law. *See Turner v. United States*, 736 F.3d 274, 281–82 (4th Cir. 2013); *Charter Oak Fire Ins. Co. v. Marlow Liquors, LLC*, 908 F. Supp. 2d 673, 685 (D. Md. 2012). A federal court's authority to sanction spoliation derives from two sources: Federal Rule of Civil Procedure 37(e)

and its "inherent power . . . to redress conduct which abuses the judicial process." *Silvestri*, 271 F.3d at 590.

Rule 37(e) provides the legal framework for evaluating spoliation claims arising from the loss or destruction of electronically stored information ("ESI"). *See Wall v. Rasnick*, 42 F.4th 214, 222–23 (4th Cir. 2022) (discussing Rule 37(e) in the context of prison video recordings). Under this rule, sanctions are available when (1) "electronically stored information that should have been preserved in the anticipation or conduct of litigation" (2) "is lost" (3) "because a party failed to take reasonable steps to preserve it," and (4) "it cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e). If the court concludes that these threshold elements are met, it must then determine what, if any, sanction is appropriate. If the court finds that the loss of ESI has prejudiced the moving party, it "may order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). If the court finds that the offending party "acted with the intent to deprive another party of the information's use in litigation," the court may: "(A) presume that the lost information was unfavorable to the party; (B) instruct the jury that it may or must presume the information was unfavorable to the party; or (C) dismiss the action or enter a default judgment." Fed. R. Civ. P. 37(e)(2).

When a party seeks sanctions based on the loss or destruction of physical documents or other tangible evidence, a court must determine whether sanctions are available under its inherent authority. *Steves & Sons, Inc. v. Jeld-Wen, Inc.*, 327 F.R.D. 96, 104 (E.D. Va. 2018). "For a court to impose a sanction under its inherent power, the party seeking sanctions must show: (1) [t]he party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) [t]he destruction or loss was accompanied by a culpable state of mind; and (3) [t]he evidence that was destroyed or altered was relevant to the claims or defenses of the party that

sought the discovery." *Id.* (internal quotation marks omitted). "This analysis is similar to the Rule 37(e) framework, as it asks whether the responsible party had a duty to preserve, and breached that duty by failing to take reasonable steps to preserve." *Id.*

**B. Analysis**

**1. Loss or Destruction of Evidence**

As reflected in Rule 37(e)(1) and decisions applying the traditional spoliation framework, evidence must be lost, destroyed, or materially altered before a court can consider the propriety of spoliation sanctions. *See NLRB v. Bannum, Inc.*, 93 F.4th 973, 983 (6th Cir. 2024) ("Implicit in spoliation is the requirement that the evidence be actually lost or destroyed . . . . Absence evidence that these records were actually spoiled, spoliation sanctions are inappropriate.").

Thomas's spoliation motions collectively involve four categories of evidence: (1) video footage of the alleged interaction between Defendant Adams and Correctional Officer Blevins outside the chow hall on June 29, 2023; (2) video footage of the alleged incident involving Defendant Adams and his assigned dog on June 30, 2023; (3) video footage of the cell shakedown conducted on August 24, 2023; and (4) the shakedown report from the search of Thomas's cell. It is undisputed that the video footage from outside the chow hall on June 29, 2023, and the shakedown report were *not* preserved. *See* Defs.' Bench Br., ECF No. 191, at 10–11. However, prison officials preserved video footage recorded by three outdoor surveillance cameras on June 30, 2023, and they preserved video footage recorded by seven surveillance cameras located in the C-3 pod on August 24, 2023. *See* Updated Video Chart, ECF No. 192.

Each of the preserved video files from June 30, 2023, has a start time of 6:50:01 and is just under ten minutes long. Thomas argues that the preserved footage did not actually capture the incident involving Defendant Adams and his assigned dog and that prison officials should have

preserved a longer timeframe of footage. As noted above, Thomas reported that the dog incident occurred "at approximately" 6:50 a.m. Although Hickman testified that she would typically allow for a five-minute window before and after an approximate time listed in a complaint or grievance, there is no indication that she or anyone else at River North saved any footage from prior to 6:50 a.m. on June 30, 2023. Thus, the court will assume that earlier footage was not preserved.

On the other hand, there is no evidence from which the court could find that additional footage from the cell shakedown on August 24, 2023, was lost or destroyed, or that the video footage preserved from that date was materially altered. In a reply brief submitted prior to the evidentiary hearing, Thomas asserted that prison officials failed to preserve footage from Max Pro cameras that would have provided a "crystal clear view" of the cell shakedown. Pl.'s Reply, ECF No. 190, at 4. He did not, however, offer any evidence to support this assertion, and Hickman testified that the only Max Pro cameras were located in a different unit at River North. Likewise, aside from complaining about the "inferior quality" of the footage preserved from the surveillance cameras in his housing unit, *id.*, Thomas presented no evidence indicating that the preserved footage was materially altered by prison officials. Thus, Thomas failed to meet his burden of establishing that additional footage of the August 24, 2023, shakedown actually existed and was lost or destroyed, or that the preserved footage was materially altered.

**2. Duty to Preserve**

Having determined that prison officials did not preserve all of the video footage referenced in Thomas's written complaints or the shakedown report from the search of his cell, the next inquiry in the spoliation analysis is whether the evidence at issue "should have been preserved." Fed. R. Civ. P. 37(e); *see also Steves & Sons, Inc.*, 327 F.R.D. at 104 ("For a court to impose a sanction under its inherent power, the party seeking sanctions must show [that the] party having

control over the evidence had an obligation to preserve it when it was destroyed or altered . . . ."). In other words, the court must determine whether "the alleged spoliator had a duty to preserve material evidence." *Turner*, 736 F.3d at 282. Here, that inquiry has two components: (1) whether the "VDOC should have reasonably anticipated litigation"; and (2) "whether it should have known that the [evidence at issue] might be relevant to such litigation."[3] *Johns v. Gwinn*, 503 F. Supp. 3d 452, 465 (W.D. Va. 2020); *see also* Fed. R. Civ. P. 37(e), advisory committee's note to 2015 amendment (explaining that Rule 37(e) is based on the common law "duty to preserve relevant information when litigation is reasonably foreseeable").

**a. Reasonable Anticipation of Litigation**

"Generally, it is the filing of a lawsuit that triggers the duty to preserve evidence." *Turner*, 736 F.3d at 282. However, "[t]he duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." *Silvestri*, 271 F.3d at 591. In determining whether a party had a duty to preserve evidence, courts may consider "whether there was an independent requirement that the lost information be preserved" such as "statutes, administrative regulations, an order in another case, or a party's own information-retention protocols." Fed. R. Civ. P. 37(e), advisory committee's note to 2015 amendment. Nonetheless,

[3] Although the VDOC is not a party to this action, courts have recognized that "state correctional departments and municipalities ultimately bear reasonability for preserving evidence and litigating cases filed by prisoners, and so their failure to preserve evidence may be imputed to individual officer defendants in order to avoid unfair prejudice to inmate litigants." *Johns v. Gwinn*, 503 F. Supp. 3d 452, 465 (W.D. Va. 2020) (internal quotation marks omitted) (collecting cases). Thus, "to prevent injustice," and because of the VDOC's "special relationship" with correctional officers, courts have held that the VDOC's duty to preserve material evidence can be imputed to defendant correctional officers. *Id.* at 465; *see also Collins v. Davis*, No. 7:22-cv-00406, 2024 WL 5011645, at *2 (W.D. Va. Dec. 6, 2024) ("This court has previously held that sanctions may be imposed upon a correctional officer defendant when the VDOC has failed in its duty to preserve relevant video evidence based on the special relationship between the VDOC aand its correctional officers.") (internal quotation marks omitted). While imputation may not be appropriate in every case filed against correctional officers, *see Wall*, 42 F.4th at 222 n.7 (acknowledging the fact-intensive nature of the inquiry), the court assumes for purposes of the pending motions that the VDOC's duty to preserve could properly be imputed to the defendants.

"the fact that a party had an independent obligation to preserve information does not necessarily mean that it had a duty to preserve that material for litigation." *Wall*, 42 F.4th at 221 n.6.

Here, at least two operating procedures imposed an independent obligation to preserve the video footage requested by Thomas. Pursuant to OP 030.1, VDOC officials were required to save a "specific audio or video recording" referenced in a grievance received from an inmate. OP 030.1 § III(D). Similarly, under OP 866.1, the institutional ombudsman was required to request that the institutional investigator "make a copy of [a specific audio or video recording referenced in a grievance] and maintain it until exhaustion of administrative remedies or pending litigation in accordance with Operating Procedure 030.1." OP 866.1 § III(C)(7)(f). As noted above, the grievance department received written complaints from Thomas that specifically referenced incidents of retaliation that allegedly occurred on June 29, June 30, and August 24, 2023, and expressly requested that all camera footage be saved. Although the defendants argue that the written complaint regarding Correctional Officer Blevins's actions on June 29 violated the "single-issue instruction" at the top of the form, Defs.' Bench Br. at 10, the VDOC policy provisions applicable to the preservation of video and audio recordings includes no single-issue limitation. Nor do the preservation provisions contain any other language suggesting that they only apply when a grievance is submitted that complies with applicable filing instructions. Instead, the preservation provisions state that "[i]f a grievance is received that references a specific audio or video recording, a copy of the recording must be saved." OP 030.1 § III(D); *see also* OP 866.1 § III(C)(7)(f).

Additionally, each of the written complaints that Thomas filed asserted that he had been retaliated against for engaging in activity protected by the First Amendment. "Several courts have held that the mere filing of grievances about an issue may trigger the duty to preserve on the part

of a correctional facility." *Johns*, 503 F. Supp 3d at 466. And, here, Thomas's written complaints and related grievances specifically complained of federal constitutional violations. Under these circumstances, the court finds that VDOC officials should have reasonably anticipated litigation after receiving Thomas's written complaints and grievances.

**b. Relevance of lost evidence**

The court must next consider whether VDOC officials should have known that the unpreserved video footage and shakedown report might be relevant to the anticipated litigation. *Id.* "Relevance in the context of spoliation is somewhat more stringent than the standard provided by Federal Rule of Evidence 401." *Id.* (internal quotation marks omitted). With respect to the duty to preserve, "courts have held that lost or destroyed evidence is relevant if a reasonable factfinder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it." *Id.* (internal quotation marks omitted); *see also Klipsch Grp., Inc. v. ePRO E-Commerce Ltd.*, 880 F.3d 620, 628 (2d Cir. 2018) ("The party seeking discovery sanctions on the basis of spoliation must show by a preponderance of the evidence . . . that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.") (internal quotation marks omitted).

Having reviewed the written complaints submitted by Thomas, the court finds that they arguably put VDOC officials on notice that the unpreserved video footage from June 29 and 30, 2023, might be relevant to anticipated litigation stemming from Thomas's allegations of retaliation. Although the fact that Correctional Officer Blevins allegedly pointed Thomas out to Defendant Adams after Thomas utilized the law library on June 29, 2023, was not sufficient, in and of itself, to give rise to a cause of action, Thomas specifically linked that incident to the retaliatory dog incident that purportedly occurred the following day. *See* ECF No. 84-1 at 2

(alleging that the K-9 officer (subsequently identified as Defendant Adams) allowed his dog to dart toward Thomas in an effort to retaliate against Thomas for exercising his First Amendment right to free speech and that the incident was "directly related to the events that occurred with C/O Blevins on 6/29/23 at 4:11 pm at dinner time"). Thus, Thomas's complaints regarding these incidents—considered in combination—arguably put VDOC officials on notice that video footage of the interaction between Correctional Officer Blevins and Defendant Adams on June 29, 2023, might be relevant to anticipated litigation stemming from the dog incident.

Based on Hickman's testimony at the evidentiary hearing, the court finds that VDOC officials also should have known that video footage from prior to 6:50 a.m. on June 30, 2023, might be relevant to anticipated litigation stemming from the dog incident. Thomas did not allege that Thomas's dog darted toward him at *precisely* 6:50 a.m. Instead, Thomas alleged that the incident occurred at *approximately* 6:50 a.m. Although Hickman testified that she would typically allow for a five-minute window before and after an approximate time listed in a complaint or grievance when saving requested video footage, that course of action was not taken in this case.

Based on Hickman's testimony and the blank shakedown report submitted at the evidentiary hearing, the court also finds that VDOC officials should have known that the shakedown report might be relevant to anticipated litigation stemming from the search of Thomas's cell on August 24, 2023. Thomas filed a written complaint alleging that his religious texts had been destroyed during a cell shakedown conducted on August 24, 2023, and that he did not know the names of the officers involved. Although he did not specifically request that the shakedown report be preserved, it is clear from the evidence presented that the report would have identified the shakedown officers and confirmed that a shakedown was conducted of Thomas's cell on August 24, 2023. As noted above, Hickman herself acknowledged that she had utilized

shakedown paperwork to identify individuals involved in a cell shakedown. Since Thomas specifically emphasized that he did not know the names of the shakedown officers who searched his cell, VDOC officials should have known that the report might be relevant.

**3. Propriety of Sanctions**

Having determined that additional video footage and the shakedown report should have been preserved in anticipation of litigation and that such evidence was lost or destroyed, the court next considers whether sanctions are appropriate. Courts have broad discretion in determining whether to impose spoliation sanctions. *Turner*, 736 F.3d at 282. For the following reasons, the court finds that sanctions are not warranted despite the loss of potentially relevant evidence.

First, there is no evidence from which the court could find that any VDOC official, much less the named defendants, acted with the state of mind necessary to warrant the severe sanctions requested by Thomas. *See Collins v. Davis*, No. 7:22-cv-00406, 2024 WL 5011645, at *2 (W.D. Va. Dec. 6, 2024) (noting that the court may consider the individual defendants' lack of culpability in the failure to preserve evidence in assessing the propriety of sanctions). In the pending motions, Thomas has requested sanctions in the form of an "adverse inference instruction," what he refers to as "issue preclusion," and "further relief up to default judgment." ECF No. 84 at 6; ECF No. 113 at 7–8. Under Rule 37(e)(2), however, an adverse inference instruction, default judgment, or presumption that lost information was unfavorable requires a finding "that the party acted with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2). Similarly, under the traditional spoliation framework, "the alleged destroyer must have known that the evidence was relevant to some issue in the anticipated case, and thereafter willfully engaged in conduct resulting in the evidence's loss or destruction." *Turner*, 736 F.3d at 282. Mere negligence does not suffice. *Id.*; *see also Doe v. Charlotte Mecklenburg Bd. of Educ.*, No. 23-182,

2024 WL 3565522, at *9 (4th Cir. July 29, 2024) (affirming the denial of an adverse inference instruction where "videos were destroyed as a matter of routine procedure" and the record revealed "no more than mere negligence in the failure to preserve the footage"). Nor does mere speculation regarding an official's state of mind. *See Lee v. Chatt*, No. 7:25-cv-00085, 2026 WL 2018872, at *4 (W.D. Va. July 13, 2026) ("Although Lee argues that Chatt acted with malicious intent, he offers no evidence to support this theory, and mere speculation is insufficient to warrant sanctions.").

Here, there is no evidence that VDOC officials intentionally destroyed additional video footage so that Thomas could not rely on it in litigation. The record reflects that officials saved multiple video files after receiving Thomas's written complaints. Although they did not save footage from outside the chow hall on June 29, 2023, or from prior to 6:50 a.m. on June 30, 2023, there is no indication that officials willfully failed to preserve such footage with knowledge that it would be relevant to Thomas's claims of retaliation.

The same is true for the shakedown report from the August 24, 2023, search of Thomas's cell. It is undisputed that Thomas did not request the report until after he filed this lawsuit in May 2025, nearly two years after the shakedown occurred. By that time, more than four months had passed since the report had been disposed of in accordance with the applicable Library of Virginia retention and disposition schedule. The fact that the report was destroyed as a matter of routine procedure after being retained for the required length of time plainly weighs against any finding of bad faith or willfulness. *See Doe*, 2024 WL 3565522, at *9; *see also ML Healthcare Servs. LLC v. Publix Super Mkts., Inc.*, 881 F.3d 1293, 1308–09 (11th Cir. 2018) (noting that the fact that the defendant acted consistent with its normal video-retention policies weighed against a finding of

bad faith). Consequently, Thomas's request for sanctions as severe as an adverse inference instruction or default judgment must be denied.

Although "only a finding of prejudice is required" to impose less severe sanctions under Rule 37(e)(1), *Wall*, 42 F.4th at 222, the court is not convinced that the loss of additional video footage results in any prejudice to Thomas. "An evaluation of prejudice from the loss of information necessarily includes an evaluation of the information's importance in the litigation." Fed. R. Civ. P. 37(e), advisory committee's note to 2015 amendment. "Generally, courts find prejudice when spoliation compromises a party's ability to present his case" or prevents a party from presenting evidence essential to his underlying claim. *Knight v. Boehringer Ingelheim Pharms., Inc.*, 323 F. Supp. 3d 837, 845 (S.D.W. Va. 2018) (citing *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 532 (D. Md. 2010)).

Here, the record reflects that any camera positioned outside the chow hall on June 29, 2023, would have been a Rapid Eye camera and that the footage recorded by the camera would have had no audio. Additionally, the court can only speculate as to the content of any footage recorded by such camera. At best, surveillance footage from outside the chow hall may have possibly shown Correctional Officer Blevins pointing at Thomas or making some other hand gesture while talking to Defendant Adams. Thomas is fully capable of testifying as to what he specifically witnessed or heard the day before Adams allegedly allowed a dog to dart toward him. The court is not persuaded that the absence of video footage from outside the chow hall compromises Thomas's ability to present his claim of retaliation against Adams.

For similar reasons, the court is unable to find that the absence of additional footage from the location of the alleged dog incident prejudices Thomas. While Hickman's testimony suggests that she would have ordinarily saved footage beginning at 11:55 a.m. on August 24, 2023, after

receiving Thomas's grievance paperwork, it is highly speculative that additional footage from that five-minute period would have clearly depicted Thomas's interaction with Defendant Allen and the dog. The quality of the footage recorded by the outdoor surveillance cameras is less than ideal, as Thomas himself emphasizes, and one of the cameras is positioned in such a manner that its preserved footage only shows the tops of individuals' heads as they cross the walkway in which the camera is placed.[4] Although inmates, officers, and a dog can be seen in footage recorded by another outdoor camera, the view from that camera is at such a distance as to make it difficult to discern the physical proximity between the dog and the inmates shown in the footage.[5] Thus, on this record, the court is unable to find that Thomas is prejudiced by the failure to preserve additional footage from June 30, 2023.

Finally, Thomas has not shown that the destruction of the shakedown report prejudices his ability to present his claim of retaliation against Defendants Parson and Melton. A review of the blank report submitted as an exhibit at the evidentiary hearing indicates that it would have only documented damaged or excessive state property discovered during the search of Thomas's cell. There is no indication that the report would have included any mention of Thomas's personal religious property, much less any notation confirming that his Bible or other religious texts were damaged or destroyed. Although Thomas correctly notes that the report would have listed the shakedown officers responsible for searching his cell, the VDOC has already identified those officers as Parson and Melton. Discovery remains ongoing at this time, and Thomas may request production of the existing documentation or information that identifies these particular officers as the shakedown officers involved in the search of his cell. He may also ask these defendants whether

---

[4] *See, e.g.*, Video File 230630065548_RNCC12Blvd&ABYard_(1)_2 at 06:54:03–06:55:00.

[5] *See, e.g.*, Video File 230630070117_RNCC55BLVDABYard_(1)_1 at 06:50:41–06:55:00.

any other officers participated in the shakedown on August 24, 2023. Under these circumstances, the court is unable to find that the destruction of the single shakedown report compromises Thomas's ability to present his case.

**IV. Conclusion**

For the reasons stated, the court declines to impose sanctions based on the VDOC's failure to preserve certain evidence. Accordingly, Thomas's motions for spoliation sanctions, ECF Nos. 84 and 113, are **DENIED**. An appropriate Order will be entered.

ENTERED: August 31, 2026

C. Kailani Memmer

C. Kailani Memmer
United States Magistrate Judge